IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CRAIG LALOUP, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, et al. | : | NO. 13-7124 |

MEMORANDUM

Dalzell, J.                                                                              July 10, 2014

I.    **Introduction**

        This unusual matter arises out of the handling of Marine Sergeant Brian LaLoup's

body after his death in Athens, Greece.  Sgt. LaLoup's parents, Craig and Beverly LaLoup,

brought this action against the United States of America, the United States Department of

Defense, the United States Department of the Navy, the Hellenic Republic (or "Greece"), and

Evangelismos General Hospital in Athens ("the Hospital").[1]  The LaLoups bring claims of

mishandling of their son's body and intentional and negligent infliction of emotional distress.

        The federal defendants[2] and the Hellenic Republic move to dismiss for lack of

subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).  The federal defendants argue

that we lack subject matter jurisdiction under the Federal Tort Claims Act, while the Hellenic

---

[1] It is not clear whether the plaintiffs have effected service on Evangelismos General Hospital in Athens.  The Hospital has not answered, but because our FSIA analysis as to the Hellenic Republic in Section IV.B, infra, also applies to bar any claims against the Hospital, we will dismiss the claims against it as well.

[2] As we discuss herein, any potential tort liability arising out of the conduct of the United States and the Departments of Defense and of the Navy exists only under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671-2680, and the only proper defendant in an FTCA action is the United States.  See id. at § 2679; see also Feaster v. Federal Bureau of Prisons, 366 Fed. Appx. 322, 323 (3d Cir. 2010) ("The only proper defendant in an FTCA suit is the United States itself.").  We will thus dismiss the Department of Defense and the Department of the Navy as defendants.  Because the United States styles its response as a response by "federal defendants", we will refer to the party alternately as "the United States" or "the federal defendants."

Republic argues for dismissal under Rule 12(b)(1) on the grounds of foreign sovereign immunity, insufficient service of process, and improper venue.  The facts giving rise to the motions are the same, but the legal arguments the parties raise differ, and so we will consider the motions separately after rehearsing the facts.

For the reasons discussed herein, we will grant in part and deny in part the federal defendants' motion to dismiss, and we will grant the Hellenic Republic's motion to dismiss.

## II.    Facts

The complaint alleges that Sergeant Brian LaLoup was stationed in Greece on August 11, 2012, when he attended a party at the Marine Security Guard Residence in Athens. Comp. ¶ 20.  At about 1:35 a.m. the next morning, some Marines saw Sgt. LaLoup sprinting from the party to the chancery, where he entered the embassy response room where Marines attached to the embassy security detail keep their weapons.  Id. at ¶¶ 26-29.  Sgt. LaLoup then pointed one of the guns at his head and fired.  Id. at ¶ 32.  The Marines took Sgt. LaLoup to Evangelismos General Hospital, and, at 3:45 a.m., he was pronounced dead.  Id. at ¶¶ 36-37. The complaint alleges that after his death Sgt. LaLoup's body was left "unguarded and alone in the Hospital morgue."  Id. at ¶ 37.  On August 12, the Marine Corps informed the plaintiffs about Sgt. LaLoup's death.  Id. at ¶ 39.

The complaint alleges that on August 18, 2012 the Greek defendants performed an autopsy on Sgt. LaLoup over the objection of the United States.  Id. at ¶ 39.  See also Fed. Def. Resp. at 3 (same); August 18, 2012 Forensics Necropsy-Autopsy Report,[3] Greece Resp. Ex. 2 (hereinafter, "Report").  Either during or after the autopsy, hospital workers removed Sgt. LaLoup's heart.  Comp. ¶ 40.  The autopsy report corroborates the complaint's allegation on this

---

[3] In compliance with this Court's rules and procedures, the Hellenic Republic has attached a certified English translation of the report, originally written in Greek, to its response.

issue.  As the medical examiner explained, "It must be mentioned that after the examination, the heart is kept in the First Pathology anatomy Lab of the Medical School of the University of Athens for at least three (3) months."  Report at 3.  On August 20, 2012, the Marines flew Sgt. LaLoup's body to Dover, Delaware, and on August 22 his body underwent a second autopsy at the Dover Air Force Base.  Comp. ¶ 40; Fed. Def. Resp. at 3.  During the August 22 autopsy, American officials discovered that Sgt. LaLoup's heart had been removed.  Comp. ¶ 43.

According to the complaint, on August 23 or 24 Marine Staff Sergeant McClendon ("SSgt. McClendon"), a Casualty Assistance Calls Officer ("CACO") called Mrs. LaLoup and told her that she needed to sign a form that would allow the Marines to release Sgt. LaLoup's body from Dover for the funeral.  During the call, SSgt. McClendon told Mrs. LaLoup that parts of Sgt. LaLoup's scalp were missing, but he told her Sgt. LaLoup's hat would cover the area and allow the LaLoups to have an open casket at the memorial service.  Comp. ¶¶ 46-51. The form, attached to the federal defendants' motion to dismiss, is a "Disposition of Remains Election Statement, Initial Notification of Identified Partial Remains."  Fed. Def. MTD at Ex. A. Shortly after the phone call, SSgt. McClendon went to Mrs. LaLoup's workplace so that she could sign the form.  The plaintiffs aver that "SSgt. McClendon went so far in his efforts to conceal Sgt. LaLoup's heart that he signed the election portions of the form himself, instead of having the Plaintiffs sign."  Comp. ¶ 52.  The federal defendants object by stating that plaintiffs contradict this assertion by admitting that Mrs. LaLoup also signed the form.  Fed. Def. MTD at 9.  It is undisputed that Mrs. LaLoup did sign the form, which contained the following statement:

> I, the undersigned, understand that every effort is being made for the full recovery of remains, but only partial remains have been recovered and identified at this time.  I am aware that additional subsequent remains may be recovered at a later date and individually identified or designated for inclusion with a group interment.

Disposition of Remains Election Statement, Fed. Def. MTD at Ex. A.

      As the complaint details, the LaLoups buried their son with full military honors on August 29, 2012.  On September 4, 2012, First Sergeant Dixon went to the LaLoups' home to ask them to sign a Request for Autopsy Report and Supplemental Information Form.  Comp. ¶ 63.  First Sgt. Dixon returned to the LaLoups' home on September 5 and September 17 with additional forms.  Id. at ¶ 64.  Mrs. LaLoup avers, and the defendants do not dispute, that on September 17 she had a conversation with First Sgt. Dixon that she describes as follows:

> During this visit, I asked him what would happen if more of Brian's scalp was recovered.  Would it be returned to us?  He looked at me funny as he started to go thru [sic] his folder and said "Ma'am, what are you talking about?"  I replied, the missing scalp parts. . . . He replied to me . . . that the scalp is not what was missing.  He even stated that he had just gone thru [sic] the folder before he came to make sure he was familiar with everything and did not recall seeing anything about missing scalp parts. . . . "Ma'am, that is not what was missing."  "I stated, what do you mean?"  He extended to me a piece of paper as he stated it was his heart that was missing.  I asked him why were we told it was parts of his scalp.  His reply was, "that they were not going to tell us because that is not something you tell a grieving mother."

Id. at ¶ 66.

      The plaintiffs aver that this news left them "absolutely devastated", id. ¶ 67, and that the "actions to conceal Sgt. LaLoup's missing heart created new levels of grief and emotional pain and suffering.  Plaintiffs were left to wonder what had really happened to their son, what had happened to his heart . . . ."  Id. at ¶ 68.

      The Complaint avers that the Hellenic Republic and the Evangelismos General Hospital shipped a heart to Dover, Delaware that they claimed belonged to Sgt. LaLoup, but

DNA testing revealed that it was not his, and the LaLoups have to this day not received Sgt. LaLoup's actual heart.  Id. at ¶¶ 73-75.

### III.    Standard of Review

Both sets of defendants bring their motions pursuant to Fed. R. Civ. P. 12(b)(1). A Rule 12(b)(1) motion "may be treated as either a facial or factual challenge to the court's subject matter jurisdiction."  Gould Electronics Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000).  The substantive distinction between a facial attack and a factual attack is that in a facial attack the defendant contests the sufficiency of the complaint, while a factual attack challenges the existence in fact of federal subject matter jurisdiction.  Procedurally, in the case of a facial attack "the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff", but in considering a factual attack, "the court may consider evidence outside the pleadings."  Id.

Our Court of Appeals has explained that a defendant cannot assert a factual attack under Rule 12(b)(1) until he has filed an answer.  See Mortensen v. First Federal Sav. and Loan Ass'n, 549 F.2d 884, 892, 892 n.17 (3d Cir. 1977).  See also, e.g., Rinaldi v. American Family Theatre, Inc., No. 93-5009, 1995 WL 12057 at *1 (E.D. Pa. Jan. 12, 1995) (Buckwalter, J.) ("a defendant must first file his answer to plaintiff's complaint before filing a 12(b)(1) motion to dismiss as a factual jurisdictional proceeding cannot occur until plaintiff's allegations have been controverted.") (internal quotations omitted).[4]

No defendant has filed an answer in this case, and so we will consider the motions to dismiss as facial attacks under Rule 12(b)(1), and we will consider the allegations in the

---

[4] Our Court of Appeals confirmed the validity of this analytical framework in Constitution Party of Pennsylvania v. Aichele, __ F.3d __, No. 13-1952, 2014 WL 3294855, at **7-8 (3d Cir. July 9, 2014).

complaint and the documents on which the complaint relies[5], taking all facts in the light most favorable to the LaLoups.[6]

      With respect to the federal defendants' motion to dismiss, and although neither party raises the issue, in determining the standard of review we observe that the arguments the federal defendants raise concern both our jurisdiction -- traditionally challenged under Rule 12(b)(1) -- and the merits of the case -- traditionally challenged under Rule 12(b)(6).  Our Court of Appeals has explained that jurisdiction is intertwined with the merits where the two inquiries involve "overlapping issues of proof."  See CNA v. United States, 535 F.3d 132, 143 (3d Cir. 2008).  Such is the case here.  Because liability under the FTCA depends upon a showing of hypothetical state tort liability -- under Pennsylvania law in this case -- proving that we have jurisdiction over the plaintiffs' claims requires a showing that the United States would be liable to the LaLoups for the torts alleged as a private person would be.

      The question of whether to treat a motion that attacks both our jurisdiction and the merits of the complaint under Rule 12(b)(1) or Rule 12(b)(6) arises because plaintiffs receive protections under Rule 12(b)(6) motions that factual Rule 12(b)(1) motions do not afford.  As our Court of Appeals has explained,

> In a Rule 12(b)(6) motion, the court evaluates the merits of the claims by accepting all allegations in the complaint as true, viewing them in the light most favorable to the plaintiffs, and determining whether they state a claim as a matter of law.  See In

---

[5] In deciding a motion to dismiss, we may consider "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record", and any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."  Pension Benefits Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

[6] The federal defendants suggest that they raise a factual attack under Rule 12(b)(1): they say that in responding to their motion the plaintiffs bear the burden of persuasion and that we may not presume the truthfulness of plaintiffs' factual averments.  Fed. Def. Resp. at 4.  As stated above, these are the standards of a factual attack, and we do not apply them here.

> re Burlington Coat Factory Securities Litigation, 114 F.3d 1410,
> 1420 (3d Cir.1997). The defendant bears the burden of showing no
> claim has been stated. See Kehr Packages, 926 F.2d at 1409. In
> contrast, in a factual attack under Rule 12(b)(1), the court may
> consider and weigh evidence outside the pleadings to determine if
> it has jurisdiction. See Mortensen, 549 F.2d at 891. The plaintiff
> has the burden of persuasion to convince the court it has
> jurisdiction. See Kehr Packages, 926 F.2d at 1409.

Gould, 220 F.3d at 178.  We note that this concern is lessened where, as here, we

consider a facial, rather than a factual, jurisdictional challenge, and thus take the

Complaint's factual allegations as true.

      Where jurisdictional challenges are intertwined with merits challenges under the

FTCA, our Court of Appeals has instructed district courts to treat such challenges as

jurisdictional ones.  See, e.g., CNA, 535 F.3d at 144 (the approach of the Third Circuit has been

to "make disputes over the scope-of-employment requirement . . . jurisdictional."); Gould, 220

F.3d at 178 ("when the merits and jurisdiction are closely related, a court may determine subject

matter jurisdiction without reaching the merits . . . .").

      But in this context the Third Circuit has cabined the jurisdictional inquiry by

cautioning that because "a district court must take care not to reach the merits of a case when

deciding a Rule 12(b)(1) motion", we should "demand 'less in the way of jurisdictional proof

than would be appropriate at a trial stage.'"  CNA, 535 F.3d at 144 (quoting Gould, 220 F.3d at

178).  Thus, we are obliged to impose a lower factual showing than would be required to succeed

on the merits of plaintiffs' claims at trial, S.R.P. ex rel. Abunabba v. United States, 676 F.3d 329,

344 (3d Cir. 2012), so that we do not prematurely dismiss claims that might be established

"given the benefit of discovery."  CNA, 535 F.3d at 145.

In any event, the United States concedes the truth of most of the allegations in plaintiffs' complaint.

**IV.**   **Discussion**

      A.      The Federal Defendants' Motion to Dismiss

            1.      The Federal Tort Claims Act

Under the doctrine of sovereign immunity, "[i]t is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." United States v. Mitchell, 463 U.S. 206, 212 (1983).  We construe the scope of a waiver of sovereign immunity strictly -- in favor of the sovereign.  Lane v. Pena, 518 U.S. 187, 192 (1996).  The FTCA constitutes a limited waiver of sovereign immunity -- it does not create a new cause of action.  Instead, it allows for the United States to be sued based on the tort law of the state in which the events giving rise to the claimed liability occurred.  See F.D.I.C. v. Meyer, 510 U.S. 471, 477 (1994) ("to be actionable under [the provision containing the FTCA's jurisdictional grant], a claim must allege, inter alia, that the United States 'would be liable to the claimant' as 'a private person' 'in accordance with the law of the place where the act or omission occurred'").  By the terms of the statute the United States is liable only "in the same manner and to the same extent as a private individual under like circumstances . . . ."  28 U.S.C. § 2674.

The FTCA does not apply to events occurring overseas.  See 28 U.S.C. § 2680(k); Smith v. United States, 507 U.S. 197, 204 (1993).

            2.      Mishandling of Sgt. LaLoup's Body

As noted above, under the FTCA we apply the "law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  Although Sgt. LaLoup's body was taken from

8

Greece to an Air Force base in Delaware, the statements the federal defendants made to plaintiffs were made in Pennsylvania, and the parties agree that we should apply Pennsylvania law.  See Fed. Def. MTD at 6; Pl. Resp. at 12.

The federal defendants first argue, and the LaLoups do not dispute, that they are not liable under the FTCA for the manner in which the autopsy was performed in Greece because the FTCA bars actions arising outside of the United States.  Fed. Def. MTD at 6.

In dispute is whether the United States is liable under Pennsylvania law -- and thus under the FTCA -- for the tort of mishandling of Sgt. LaLoup's body.  The United States contends that to state a claim for mishandling of a body under Pennsylvania law a plaintiff must show that the defendant acted with intent rather than mere negligence.  Id.  The United States contends that "[e]ven a generous reading of plaintiffs' allegations with respect to the [federal defendants'] treatment of Sgt LaLoup's body does not suggest intentional mishandling."  Id.  The LaLoups respond that Pennsylvania's mens rea requirement for the mishandling of a body is wantonness, and that there is sufficient evidence that the federal defendants acted wantonly to allow plaintiffs to state a claim.

The Pennsylvania Supreme Court first recognized the tort of interference with a dead body in Papieves v. Lawrence, 263 A.2d 118 (1970).  Under the First Restatement of Torts, § 868, as Papieves adopted it, "one who wantonly mistreats or, acting without privilege, intentionally withholds the body of a decedent is liable in tort to the member of the decedent's family who is entitled to the disposition of the body."  Papieves, 263 A.2d at 377 (internal quotations omitted) (citing Restatement (First) of Torts § 868 (1939)).

Recently, in Weiley v. Albert Einstein Medical Center, 51 A.3d 202 (Pa. Super. Ct. 2012), the Pennsylvania Superior Court clarified that:

9

> A plain reading of section 868 reveals that a party can plead that
> the defendant acted with a wanton state of mind in the
> mistreatment of a body, as per the first portion of section 868, or
> that the defendant acted intentionally, without privilege, to remove,
> withhold or operate on the dead body, as per the second portion of
> section 868, or that the defendant acted with both states of mind.

Id. at 209.[7]  Weiley explicitly declined to expand the mental state requirement to include

negligence.  Id. at 214.  ("Pennsylvania has not yet adopted the revised version of section 868 to

include negligent interference with a body, and we are currently restricted to the Papieves

Court's limitation of this tort to wanton or intentional conduct in accordance with the First

Restatement of Torts section 868.").  See also Hackett v. United Airlines, 528 A.2d 971, 974 (Pa.

Super. Ct. 1987).

Since neither party contends that the United States intentionally mishandled Sgt.

LaLoup's body, the question becomes whether it acted wantonly.  Papieves explained that

wanton mishandling of a body has been found to include, inter alia, "the unlawful interment or

disinterment of a body, intentional interference with a burial, the wanton mutilation or

unauthorized embalming of a corpse, and other intentional, reck[l]ess or wanton acts likely to

cause severe emotional distress."  Papieves, 263 A.2d at 120.  The Court summarized that "the

underlying, and we believe real, issue is the right of a decedent's nearest relatives to protection

against intentional, outrageous or wanton conduct which is peculiarly calculated to cause them

serious mental or emotional distress."  Id. at 121.  Weiley clarified that Papieves 's "peculiarly

calculated" inquiry does not require that the defendant's action be intended to cause the distress:

requiring the plaintiff to "plead facts to establish that [the defendant] had the specific intent or

desire to [mishandle the body] for the purpose of causing [the plaintiff] to have serious mental

---

[7] The Court also explained that "[i]n either event, the plaintiff must also establish that he or she
is a family member of the decedent who is entitled to the disposition of the body", Weiley, 51
A.3d at 209.  Neither party contests that element here.

distress" would not "comport with what the Papieves Court required for the state of mind element in the tort of interference with a dead body." Weiley, 51 A.3d at 210. Instead, the "peculiarly calculated" prong requires that the "intentional or wanton act be 'likely to cause severe emotional distress.'" Id. (quoting Papieves, 263 A.2d at 120).

The LaLoups argue that after the federal defendants conducted a second autopsy at Dover Air Force Base they knew that Sgt. LaLoup's heart had been removed and "[i]nstead of informing the family that Sgt. LaLoup's remains were incomplete and taking the necessary steps to recover the heart, the U.S. Defendants decided to conceal this information from the Plaintiffs." Pl. Resp. at 14-15. The LaLoups contend that "the U.S. Defendants wantonly invaded the Plaintiffs' interest in the body of Sgt. LaLoup, interfering with his burial, by trying to conceal the fact that his body was missing his heart", id. at 15, and "knew or should have known that discovery of this deception would cause acute and lasting emotional distress." Id.

The United States responds that "Plaintiffs have not alleged how the federal defendants mistreated Sgt LaLoup's body in any manner." Fed. Def. Reply at 2-3. It argues that "the federal defendants' failure to affirmatively tell the grieving Mrs. LaLoup that her son's heart was missing" cannot be said to be "substantially certain to cause her distress." Id. at 3 (emphasis in original). Instead, the United States argues that "to the extent that plaintiffs allege any action against the Marines, it is that they made 'alleged misrepresentations' to Mrs. LaLoup, and not that they did anything disrespectful to Sgt LaLoup's body." Id.

In determining whether the federal defendants' conduct in this case -- failing to tell Mrs. LaLoup that her son's body was missing his heart -- rises to the level of wantonness, we look to other Pennsylvania cases in which the courts have found a defendant's behavior to be wanton. In Papieves, the Supreme Court found actionable the conduct of two young men who

11

hit a fourteen-year-old boy with their car and buried him in a shallow grave without informing the boy's parents or attempting to obtain medical assistance.  The Court found that the boy's parents could recover for the emotional suffering they experienced when the partially-decomposed body of their son was discovered.  In <u>Weiley</u>, the Superior Court found that a hospital's conduct might be wanton where, knowing that a decedent's family did not wish him to be an organ donor, the hospital made only cursory efforts to contact the family after decedent's death before sending the decedent's body without permission to a nearby university, where his organs were removed.  In <u>Hackett</u>, on the other hand, the Superior Court found no wanton conduct where the plaintiff had been told after her mother's death that a bronze casket would protect her mother's body during air shipment only to find, upon arrival, that "the casket had sustained numerous dents during the trip, severely damaging both the casket and the body of [plaintiff's] mother."  <u>Hackett</u>, 528 A.2d at 972.

       As we described above, where, as here, the jurisdictional challenge and the merits challenge are intertwined in a Rule 12(b)(1) motion, we need not demand that plaintiffs prove their case to the standard required at trial.  But even under a more relaxed standard, the evidence the plaintiffs have adduced does not come close to showing that the United States here acted in a wanton manner.  Though the removal of the heart -- which we will discuss below -- might have been "likely to cause severe emotional distress", the likelihood that failure to tell the LaLoups about the removal would cause them emotional distress was not so obvious as to constitute wanton conduct.  Under this reasoning, the United States would not be liable under Pennsylvania state law, and so this claim does not fall within the waiver of sovereign immunity embodied in 28 U.S.C. § 2674.  We thus lack subject matter jurisdiction over this claim with regard to the United States.

3.    <u>Intentional Infliction of Emotional Distress</u>
    a.    <u>The "Misrepresentation Exception"</u>

The United States argues that we do not have jurisdiction over the plaintiffs' claims for intentional infliction of emotional distress because "these claims are founded upon misrepresentations" and "the United States has not waived immunity for claims involving misrepresentation."  Fed. Def. MTD at 7.

28 U.S.C. § 2680(h) bars recovery under the FTCA for claims "arising out of" a number of specified torts, including "misrepresentation" and "deceit".  The Supreme Court has held that this "misrepresentation exception" encompasses claims for intentional or negligent concealment, misrepresentation, or omissions of material facts.  <u>United States v. Neustadt</u>, 366 U.S. 696, 705-707 (1961).

The LaLoups argue that the misrepresentation exception does not preclude their intentional infliction of emotional distress claim because they contend that it only applies to commercial transactions in which a plaintiff relied on the misrepresentation.  Pl. Resp. at 19-20.

In <u>Block v. Neal</u>, 460 U.S. 289, 296 (1983), the Supreme Court explained that

> The "misrepresentation" exception applies only when the action
> itself falls within the commonly understood definition of a
> misrepresentation claim, which "has been identified with the
> common law action of deceit," and has been confined "very largely
> to the invasion of interests of a financial or commercial character,
> in the course of business dealings."

<u>Id.</u> at 296 n.5.

As the United States concedes, there is some debate about whether the misrepresentation exception applies only in the commercial context.  <u>See</u> Fed. Def. MTD at 7 (citing <u>Kohn v. United States</u>, 680 F.2d 922, 926 (2d Cir. 1982); <u>Neustadt</u>, 696 U.S. at 711 n.26).

The statute, by its terms, is not limited to commercial transactions.  See 28 U.S.C. § 2680(h).

Recognizing this, courts have applied the exception to other torts outside of the commercial

context, such as personal injury torts.  See, e.g., Lawrence v. United States, 340 F.3d 952 (9th

Cir. 2003).  Our own Court of Appeals has recognized a reliance requirement, but it has declined

to explicitly limit the exception to cases involving financial injury.  See JM Mechanical Corp. v.

United States, 716 F.2d 190, 194 (3d Cir. 1983) (the exception bars actions "for recovery under

the FTCA only when a party alleged no injury that he would have suffered independently of his

reliance on a misrepresentation or an omission.") (citing Block v. Neal, 460 U.S. 289 (1983)).

Other courts have declined to extend the exception beyond the commercial

context: in Kohn, the Second Circuit reversed the district court's dismissal of an action against

the United States involving a misrepresentation on the ground that the suit was not commercial

in nature:

> Although the misrepresentation and deceit exceptions encompass
> both negligent and willful failure to provide accurate information,
> these exceptions have generally been applied only to actions for
> damages due to commercial decisions that were predicated on
> incorrect or incomplete information.  Because the context here is
> hardly commercial in nature, we do not believe that appellants'
> claims are necessarily barred as an action for misrepresentation or
> deceit.

Kohn, 680 F.2d at 926 (internal quotations omitted).  As Judge Troutman explained in declining

to extend the misrepresentation exception to a case of negligent misrepresentation involving

safety data, rather than an impairment of financial interests, "most courts continue to hold that

the misrepresentation bar goes 'most often' to cases involving business transactions.  Although

there may be and probably are grounds for differences of opinion, we conclude that the scope of

the misrepresentation exception is not so broad as to bar this suit."  General Public Utilities Corp. v. United States, 551 F. Supp. 521, 529 (E.D. Pa. 1982).

In the wake of such divergent precedent, we are reluctant to unnecessarily opine on the scope of the exception.  Because, as we discuss below, we find that the federal defendants' conduct did not rise to the level of outrageousness required to sustain a claim of intentional infliction of emotional distress, we need not reach the question of whether the misrepresentation exception bars plaintiffs' claim.

b.      Stating A Claim For Intentional Infliction
Of Emotional Distress Under Pennsylvania Law

The federal defendants argue that even if we do not apply the misrepresentation exception, the plaintiffs have failed to state a claim for intentional infliction of emotional distress under Pennsylvania law.

Although the Pennsylvania Supreme Court "ha[s] never expressly recognized a cause of action for intentional infliction of emotional distress," Taylor v. Albert Einstein Medical Center, 754 A.2d 650, 652 (Pa. 2000), Pennsylvania courts have allowed plaintiffs to recover on this theory, and, in evaluating claims of intentional infliction of emotional distress, have applied the standard set forth in the Restatement (Second) of Torts.  See id.  According to that Restatement, in order to prevail on a claim of intentional infliction of emotional distress, a plaintiff must establish four elements: "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe."  Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265, 1273 (3d Cir. 1979) (rehearsing the elements under Restatement (Second) of Torts § 46 (1965)).

15

As the Pennsylvania Supreme Court notes, "courts have been chary to allow recovery for a claim of intentional infliction of emotional distress." Hoy v. Angelone, 720 A.2d 745, 753 (Pa. 1998). It is for the court to determine in the first instance whether the plaintiff's allegations satisfy the first element -- outrageousness. See Johnson v. Caparelli, 625 A.2d 668, 671 (Pa. Super. 1993). In order to state such a claim, a plaintiff must allege conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Hoy, 720 A.2d at 754 (quoting Buczek v. First National Bank of Mifflintown, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987)). Even where a "defendant has acted with intent which is tortious or even criminal," id., Pennsylvania courts have not found liability. Contrary to intuition or lexical logic, even where a defendant "has intended to inflict emotional distress", courts have found no liability for intentional infliction of emotional distress. Id. As the Restatement (Second) of Torts explains, "[g]enerally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Restatement (Second) of Torts § 46 Comment d (1965). Pennsylvania courts have found liability for the tort only in utterly egregious cases, such as in Papieves, described above, or Banyas v. Lower Bucks Hospital, 437 A.2d 1236 (Pa. Super. 1981), where the defendants intentionally fabricated records suggesting that the plaintiff had committed a homicide, leading to the plaintiff's indictment.

The federal defendants argue that the "decision to not specifically provide a detailed accounting of missing body parts cannot be considered extreme or outrageous." Fed. Def. MTD at 10. Even assuming "that the United States Marine Corps . . . deliberately decided to withhold information regarding Sgt LaLoup's missing heart, that conduct still does not rise to

the outrageous level necessary to sustain such a claim", because "[i]f a judgment call was made - - to not directly state to grieving parents every detail known to the Marine Corps regarding their son's suicide and post-mortem autopsy, such an action would not be outrageous."  Id.

The LaLoups counter that "[i]t is clearly outrageous that a family, who has lost a son in the service of this country, would be lied to about the status of his body", and they contend that "everyone who has been told of this story, including the Plaintiffs' local Congressman[,] have been outraged at the Department of Defense's conduct in this case."  Pl. Resp. at 22.  They appear to argue that both the initial non-disclosure, and the subsequent disclosure, give rise to liability for intentional infliction of emotional distress because "[b]eyond the outrage felt by the family at being lied to, the realization that they have buried their son without his heart has led to the family suffering additional severe emotional distress . . . ."  Id.

We pause to clarify the conduct the United States engaged in that forms the basis of the plaintiffs' complaint.  Reading the complaint in the light most favorable to the LaLoups, that conduct is either SSgt. McClendon telling Mrs. LaLoup that the portion of her son's remains that was missing was a piece of his scalp, or First Sgt. Dixon's subsequent decision to tell Mrs. LaLoup that her son's heart was missing.[8]  But even if both decisions were intentional or reckless, neither is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  Hoy, 720 A.2d at 754.  Rather than "extreme and outrageous", the decisions reflect

---

[8] We note that this account, which the United States does not dispute, is inconsistent with the federal defendants' tendentious assertion that Mrs. LaLoup's initial understanding of the condition of her son's remains was a "mistaken assumption[]."  Fed. Def. MTD at 9.  Though not actionable under a theory of intentional infliction of emotional distress, Mrs. LaLoup's mistake was not an assumption, but a direct recitation of the (mis)information the Marines initially gave her.

contrary approaches to relaying uncomfortable facts to a grieving parent.  We will grant the federal defendants' motion with respect to this claim.

4.      Negligent Infliction of Emotional Distress

Finally, the federal defendants contend that the LaLoups have failed to state a claim for negligent infliction of emotional distress.

In Toney v. Chester County Hosp., 36 A.3d 83 (Pa. Super. Ct. 2011), the Pennsylvania Superior Court recognized a tort for negligent infliction of emotional distress where a plaintiff suffered emotional harm of a type "likely to be experienced as a visceral and devastating assault on the self" caused by the breach of a duty arising out of a "preexisting relationship[] involving duties that obviously and objectively hold the potential of deep emotional harm in the event of breach", such as "relationships involving life and death."  Id. at 95.[9]

In concluding that recovery for such a tort was available, Toney observed that courts throughout the country have recognized that "some negligent breaches of duties in preeexting relationships will give rise to severe emotional distress that should be compensable." Id. at 91.  For example, these courts have "recognized certain categories of relationships as being

---

[9] The federal defendants note that Toney "is . . . without precedential value", Fed. Def. MTD at 11.  Of course, an intermediate appellate court's statement of the law is not controlling where the state Supreme Court has not addressed the issue, see, e.g., Robinson v. Jiffy Executive Limousine Co., 4 F.3d 237, 242 (3d Cir. 1993), but we are nevertheless obliged to "give serious consideration to the decisions of the intermediate appellate courts in ascertaining and applying state law."  Id.  Moreover, as the Pennsylvania Superior Court explained in Weiley -- a case the federal defendants cite for the proposition that Toney is not controlling -- the Pennsylvania Supreme Court did affirm Toney.  See Weiley, 51 A.3d at 217 n. 16 ("Recently . . . our Supreme Court issued an opinion in support of affirmance in Toney.  Since the Court was divided evenly, this opinion does not have precedential value, although it has persuasive value. . . .  Importantly, it also serves to affirm our Court's decision in Toney.") (citing Commonwealth v. Dorman, 547 A.2d 757, 761 (Pa. 1988), in which the Superior Court explained that where a divided Supreme Court has affirmed a Superior Court decision, the effect is to affirm the Superior Court decision, but the reasoning of the Supreme Court decision has no precedential value.).

amenable to the imposition of liability for emotional distress, such as the relationship between the loved ones of the deceased and those responsible for caring for the corpse." Id. at 92.  (citing Menorah Chapels at Millburn v. Needle, 899 A.2d 316 (N.J. Super. Ct. 2006) (breach for funeral services contract can support damages claim); Freeman v. Harris County, 183 S.W.3d 885, 890 (Tex. Ct. App. 2006) (finding compensable injuries arising out of "contracts dealing with intensely emotional noncommercial subjects such as preparing a corpse for burial").

   The federal defendants' alleged liability for this claim thus depends upon whether they owe the LaLoups a duty of care.  They argue that they do not: "[t]he federal defendants simply did not have the type of relationship towards plaintiffs that would qualify for such a claim since there is no contractual or fiduciary duty toward the parents of an adult service member under these circumstances."  Fed. Def. MTD at 12.  The LaLoups, unsurprisingly, counter that they do: "the U.S. Defendants owed a duty of care to the Plaintiffs by virtue of the parties' special relationship."  Pl. Resp. at 24.

   The existence of a duty is a matter of law for a court to decide, see, e.g., R.W. v. Manzek, 888 A.2d 740, 746 (Pa. 2005), and Toney made clear that, rather than enumerating all relationships that would give rise to such a duty, the court left "the legal question of whether a sufficient duty exists to our trial judges to decide on a case-by-case basis," Toney, 36 A.3d at 95. According to the facts alleged in the complaint, the relationship between a CACO and a deceased service member's family might well involve a duty that would give rise to liability -- the relationship involves life and death, and Toney recognized that those caring for the bodies of family members' deceased relatives have been found to have a duty to family members.  See Toney, 36 A.3d at 92.

Reading the facts in the light most favorable to the plaintiffs, as we must at this juncture, we find that they have alleged facts sufficient to give rise to the reasonable inference that CACOs owed a duty to plaintiffs.  We cannot determine at this juncture whether there in fact existed such a duty, as the record lacks information that would assist us in reaching a conclusion on this point such as, <u>inter</u> <u>alia</u>, the nature of a CACO's job, any provisions in the contract Sgt. LaLoup signed when he entered the Marines regarding the care of his body in the event of his death, and any Marines procedures that would shed light on the question.

We therefore find, drawing all reasonable inferences in the plaintiffs' favor, that at this stage the complaint suffices to state a claim for negligent infliction of emotional distress, and so we will deny the federal defendants' motion as to Count III.

B.      <u>The Hellenic Republic's Motion to Dismiss</u>

The Hellenic Republic argues that the complaint must be dismissed for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) on the ground of sovereign immunity.  Though the Hellenic Republic does not specify which standard of review it believes governs, as we discussed in Section III, <u>supra</u>, because neither party has filed an answer, we will consider the 12(b)(1) motion as a facial, rather than a factual, attack, and we will thus take as true plaintiffs' factual averments and "only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." <u>Gould</u>, 220 F.3d at 176.  In assessing this motion, brought under both Rule 12(b)(1) and 12(b)(6), we bear in mind the standards that govern Rule 12(b)(6) review -- we must consider whether the plaintiffs have pled "factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged", Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

As the Supreme Court has stressed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action . . . do not suffice."  Id. (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) for the proposition that courts "are not bound to accept as true a legal conclusion couched as a factual allegation").

The Hellenic Republic also argues that even assuming we have subject matter jurisdiction, we lack personal jurisdiction because the plaintiffs have failed to serve Greece properly. Finally, it contends that even if we have jurisdiction over Greece, venue in the United States is improper.  We consider first the sovereign immunity argument, and, because we find that we lack jurisdiction over the LaLoups' claim against Greece under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 et seq., we need not consider Greece's other objections.

A.    Foreign Sovereign Immunity

1.    Standard of Review

The Hellenic Republic first argues that we lack subject matter jurisdiction because, as a foreign sovereign, it is immune to suit in United States courts.  The principle of foreign sovereign immunity has long barred suits against foreign sovereigns in United States federal and state courts as a matter "of grace and comity on the part of the United States." Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 486 (1983).  The FSIA codifies the principle of foreign sovereign immunity, and it provides that a "foreign state shall be immune

from the jurisdiction of the courts of the United States and of the States" unless one of a set of listed exceptions applies.  Id. at § 1604.

The FSIA embodies the "restrictive theory" of sovereign immunity, whereby "the immunity of the sovereign is recognized with regard to sovereign or public acts (jure imperii) of a state, but not with respect to private acts (jure gestionis)."  West v. Multibanco Comermex, S.A., 807 F.2d 820, 824 (9th Cir. 1987) (quoting Jack B. Tate, Changed Policy Concerning the Granting of Sovereign Immunity to Foreign Governments, 26 Dep't St.Bull. 984 (1952) (hereinafter "the Tate Letter").  See also, e.g., Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 612 (1992) ("the Act (and the commercial exception in particular) largely codifies the so-called 'restrictive' theory of foreign sovereign immunity first endorsed by the State Department in 1952" in the famous Tate Letter).  The restrictive theory replaced the earlier "absolute" theory whereby "if there is formal involvement in the activity in question by a foreign sovereign, such involvement renders that activity immune from scrutiny by domestic courts."  West, 807 F.2d at 824.

The exceptions to the FSIA reflect the restrictive theory, and those exceptions "provide[] the 'sole basis' for obtaining jurisdiction over a foreign sovereign in the United States."  Weltover, Inc., 504 U.S. at 611 (1992).

The only one of the FSIA's exceptions at issue here is the expropriation exception described in 28 U.S.C. § 1605(a)(3).  See Pl. Resp. at 25; Greece Reply at 2.  The expropriation exception provides that:

(a)  A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case --

. . .

22

(3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States . . ..

28 U.S.C. § 1605(a)(3).

Our Court of Appeals outlined the burden-shifting framework of the FSIA in Federal Ins. Co. v. Richard I. Rubin & Co., Inc., 12 F.3d 1270 (3d Cir. 1993).  Under this framework, a defendant moving to dismiss bears the initial burden of making a prima facie case that it is a foreign state within the meaning of the FSIA.  Once the defendant has met this burden, "the burden then shift[s] to the plaintiffs to establish that one of the exceptions to immunity applie[s]", but "the ultimate burden of proving immunity from suit lies with the [defendant]."  Id. at 1285.  In reaching this conclusion, our Court of Appeals relied on a House report that

reflects Congress' intent to create a burden-shifting process when foreign states plead a defense of immunity under the FSIA.

[The FSIA] starts from a premise of immunity and then creates exceptions to the general principle . . . Once the foreign state has produced [] prima facie evidence of immunity, the burden of going forward [] shift[s] to the plaintiff to produce evidence establishing that the foreign state is not entitled to immunity.  The ultimate burden of proving immunity rest[s] with the foreign state.

Id. at 1285 n.13 (quoting H.R. Rep. No. 1487, 94th Cong., 2d Sess. 17 (1976)).  See also, e.g., Supra Medical Corp. v. McGonigle, 955 F. Supp. 374, 378 (E.D. Pa. 1997) (Broderick, J.) (citing Federal Ins. Co. for this proposition).

The FSIA applies only to "foreign states", see, e.g., 28 U.S.C. § 1603; Federal Ins. Co., 12 F.3d at 1285.  The parties unsurprisingly concede that the Hellenic Republic is a

foreign state within the meaning of 28 U.S.C. § 1603, and so we consider whether the LaLoups have met their burden of showing that the expropriation exception applies.

With regard to expropriation claims under 28 U.S.C. § 1605(a)(3), the Ninth Circuit has held that "[a]t the jurisdictional stage, [the court] need not decide whether the taking actually violated international law; as long as a claim is substantial and non-frivolous, it provides a sufficient basis for the exercise of [] jurisdiction." Altmann v. Republic of Austria, 317 F.3d 954, 968 (9th Cir. 2002) (internal quotations omitted).

As the Supreme Court explained in First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611 (1983), because the FSIA provides that for "any claim for relief with respect to which a foreign state is not entitled to immunity . . ., the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances", 28 U.S.C. § 1606 (emphasis added), where "state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances." First Nat. City Bank, 462 U.S. at 622 n.11. See also, e.g., Saudi Arabia v. Nelson, 507 U.S. 349, 374 (1993) (quoting First Nat. City Bank for this proposition and noting that "[i]f the governing state law . . . would permit an injured person to plead and prove a tortious wrong" for the injury plaintiffs claimed, then the FSIA did not provide authority to apply a different law). We thus apply Pennsylvania substantive law to the LaLoups' tort claims.

2.      Discussion

As described above, the LaLoups contend that the Hellenic Republic's conduct falls under the second clause of the expropriation exception -- in other words, they agree that (1) the action involves "rights in property taken in violation of international law"; (2) "that property

24

or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state"; and (3) "that agency or instrumentality is engaged in a commercial activity in the United States."  Id. at § 1605(a)(3).  The parties disagree as to the applicability of each prong of the exception.

> i.    Rights In Property Taken In Violation Of International Law

The Ninth Circuit -- which appears to have encountered far more § 1605(a)(3) cases than the Third Circuit -- explains that in determining what constitutes a taking in violation of international law, courts may look to "court decisions, United States law, the work of jurists, and the usage of nations."  Altmann v. Republic of Austria, 317 F.3d 954, 968 (9th Cir. 2002).

The Restatement (Third) of Foreign Relations Law of the United States § 712 (1987) does not discuss § 1605(a)(3) explicitly, but it sheds light on the statute's meaning because it describes foreign sovereign takings that violate international law.  It says that a state "is responsible under international law for injury resulting from: (1) a taking by the state of the property of a national of another state that (a) is not for a public purpose, or (b) is discriminatory, or (c) is not accompanied by provision for just compensation".  Restatement (Third) of Foreign Relations Law of the United States § 712 (1987).  The Ninth Circuit appears to have adopted this three-part formula.  See, e.g., Cassirer v. Kingdom of Spain, 616 F.3d 1019, 1027 (9th Cir. 2010); Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 711 (9th Cir. 1992).  Moreover, as the Ninth Circuit explained in Siderman, "[t]he legislative history of the FSIA reveals a similar understanding of what constitutes a taking in violation of international law."  Id. at 712 (quoting H.R. Rep. No. 1487, 94th Cong., 2d Sess. 19-20 for the principle that a "taking

violates international law if it is done 'without payment of the prompt adequate and effective compensation required by international law' or is 'arbitrary or discriminatory in nature.'"). [10]

Greece argues that the expropriation exception does not apply because it concerns only deprivations of property that cause economic injury, and it contends that the LaLoups do not have a property right in Sgt. LaLoup's body that would give rise to such an injury.  Greece Reply at 3.  In support of this argument, Greece cites Prosser and Keeton for the proposition that although "courts have talked of a somewhat dubious 'property right' to the body," this right "can be used for only the one purpose of burial, and has no pecuniary value . . . ."  Id. (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 12 at 63) (W.P. Keeton 5th ed. 1984).  The LaLoups argue that "the body of Sgt. LaLoup was the property of the Plaintiffs."  Pl. Resp. at 27.

We consider first the nature and extent of the LaLoups' property right in Sgt. LaLoup's body, and we then determine whether § 1605(a)(3) contemplates this type of right.

Pennsylvania courts have long recognized a quasi-property right in a decedent's body for the next-of-kin.  In Pettigrew v. Pettigrew, 56 A. 878 (Pa. 1904), the Pennsylvania Supreme Court explained that "the law recognizes property in a corpse, but property subject to a trust, and limited in its rights to such exercise as shall be in conformity with the duty out of which the rights arise", id. at 879, that is, "[t]he duty of disposition".  Id.  Pennsylvania courts continue to recognize this right today.  See, e.g., Geiges v. Rosko, 49 Pa. D. & C.3d 61, 66 (Pa.

---

[10] To these three criteria, the LaLoups add that a taking violates international law if it "violates an actual treaty or convention."  Pl. Resp. at 26.  In support of this contention, they cite West v. Multibanco Comermex, S.A., 807 F.2d 820, 831-33 (9th Cir. 1987), and § 712 of the Restatement (Third) of Foreign Relations Law.  The Ninth Circuit in West does not discuss conformity with treaties and conventions, nor does § 712 of the Restatement (Third) of Foreign Relations Law.  Because we find that the LaLoups cannot meet the third prong of § 1605(a)(3) -- the "commercial activity" prong -- we need not decide whether any failure to conform to treaties or conventions resulted in a taking in violation of international law here.

Com. Pl. 1987) (recognizing "a quasi property right in a decedent's remains vesting in the nearest relatives of the deceased and arising out of their duty to bury their dead."); <u>Whitson v. City of Philadelphia</u>, No. 07-2832, 2008 WL 4739532 (E.D. Pa. Oct. 27, 2008) (Buckwalter, J.) ("multiple trial courts in Pennsylvania have recognized that next of kin have special 'quasi property' rights in a decedent's remains arising out of their duty to bury the dead.").

As these Pennsylvania courts have suggested, this is only a <u>quasi</u>-property right, for it is limited to the right to bury the remains of the deceased.  Other courts recognizing the same right have explicitly noted that it does not carry any economic value: "[t]he quasi-property right in a corpse is not pecuniary in nature, nor should it be.  The right encompasses only the power to ensure that the corpse is orderly handled and laid to rest, nothing more."  <u>Bauer v. North Fulton Medical Center, Inc.</u>, 527 S.E.2d 240, 244 (Ga. Ct. App. 1999).

Thus, under Pennsylvania law, the LaLoups do appear to have a quasi-property right in Sgt. LaLoup's body arising out of, and limited to, their burial duties.  Because they were not able to bury his body with heart intact, they were deprived of that right.

We must next consider whether that deprivation was a violation of international law.  Greece argues that any taking of Sgt. LaLoup's body was not a violation of international law under § 1605(a)(3) because that section applies only to deprivations that cause economic injuries, and as just described the LaLoups can have no <u>economic</u> interest in their son's body.

Greece cites Restatement (Third) of Foreign Relations Law of the United States § 712 (1987), discussed above, in support of its argument that § 1605(a)(3) pertains only to economic injuries.  Greece Reply at 3.  We agree with Greece that § 712 of the Restatement suggests that 28 U.S.C. § 1605(a)(3) seeks to remedy only those property deprivations that could result in economic injury.  Section 712 is entitled "State Responsibility for Economic Injury to

27

Nationals of Other States", and the Comment notes, "[t]his section sets forth the responsibility of a state under customary international law for certain <u>economic</u> injury to foreign nationals." Restatement (Third) of Foreign Relations Law of the United States § 712, Comment a (1987) (emphasis added).

    In arguing that § 1605(a)(3) is not limited to economic injuries, the LaLoups say that "the plain language of Section 1605(a)(3) refutes the argument that the expropriation must be commercial in nature" because "[t]he statute demands only that 'rights in property taken in violation of international law' be at issue; it does not say 'rights in property of a commercial nature taken in violation of international law.'"  Pl. Resp. at 26.  This argument does not illuminate the statute's meaning because Congress need not specify that property rights be of a commercial character in order to refer only to economic injuries.  For example, as we discuss below, the only kind of right that warrants compensation is a property right that carries economic entitlements, and that is so whether Congress specifically defines those rights as "commercial" in the statute or not.  The LaLoups do not cite any instance in which courts have applied § 1605(a)(3) to non-economic injuries.

    Nevertheless, the disjunctive nature of the three-part test set forth in § 712 of the Restatement suggests that "takings in violation of international law" might not be limited to those takings that result in economic injury.  Only the third criterion -- referring to just compensation -- necessarily refers to takings that result in economic injury since a deprivation of property that is monetarily compensable must involve property in which the deprived has a monetary interest.  The other two criteria do not necessarily concern economic deprivation and so do not support Greece's argument that § 1605(a)(3) refers only to economic injuries.

There is little jurisprudential guidance on this question -- it seems that our Court of Appeals has never addressed the operation of § 1605(a)(3) -- but the provision does appear to be used to redress economic injuries.  See, e.g., Republic of Austria v. Altmann, 541 U.S. 677 (2004) (addressing taking of several Gustav Klimt paintings).

In the absence of clearer guidance on whether § 1605(a)(3) is limited to economic injuries, we will not find here that it is so limited and will instead consider whether any of the three criteria for a taking in violation of international law encompasses the LaLoups' claim.  As we have already discussed, because the LaLoups do not have an interest in Sgt. LaLoup's body that is monetarily compensable, we find that the provision requiring just compensation does not contemplate the kind of taking at issue here.  Instead, we turn to the criteria addressing the discriminatory nature and public purpose of the taking.

The LaLoups' complaint is short on factual allegations regarding the Hellenic Republic.  As described above, the complaint says only that the Hellenic Republic is responsible for the actions of doctors at the Evangelismos General Hospital in Athens, where Sgt. LaLoup's body was taken the night of his death, and that on August 18, 2012 "the Greek Defendants performed an illegal autopsy on Sgt. LaLoup, in violation of his diplomatic immunity and without the consent of the next of kin.  The autopsy was also performed over the objection of the United States Government."  Comp. at ¶ 39.

The LaLoups do not make any factual allegations that would support an inference that Sgt. LaLoup was discriminated against on the basis of his alien status in Greece.  Instead, the statement in the autopsy report that "after the examination, the heart is kept in the First Pathology anatomy Lab of the Medical School of the University of Athens for at least three (3)

months", Report at 3, suggests that the taking of the heart was a standard practice rather than discrimination.

   We turn finally to the question of whether the taking was for a public purpose. Considering the pleadings in the complaint, matters of public record, and any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document", Pension Benefits Guar. Corp., 998 F.2d at 1196, we find that the plaintiffs have pled facts sufficient to give rise to the inference that the taking was not for a public purpose.

   The LaLoups pled that "[e]ither before or [a]s part of the illegal autopsy, Greek hospital workers removed Sgt. LaLoup's heart", Comp. ¶ 40, and that "[i]n an attempt to pacify the Plaintiffs, the Greek Defendants had a heart shipped to Dover, Delaware claiming that it was Sgt. LaLoup's missing heart", but "DNA testing revealed that the heart was not that of Sgt. LaLoup." Id. at ¶¶ 73-74.  As described above, the "Forensics Necropsy-Autopsy Report" notes, "[i]t must be mentioned that after the examination, the heart is kept in the First Pathology anatomy Lab of the Medical School of the University of Athens for at least three (3) months." Greece MTD Ex. 2.  No public purpose is apparent from this statement, and we note that when the LaLoups made inquiries about the heart Greece did not defend itself by saying that the heart had been taken for a public purpose -- instead, Greece sent the LaLoups a heart supposedly belonging to Sgt. LaLoup that in fact belonged to someone else.  This seeming deception also fails to demonstrate a public purpose.

   We therefore find at this stage that the plaintiffs have met their burden of stating facts sufficient to show that their takings claim is "substantial and non-frivolous," see, e.g., Altmann, 317 F.3d at 968, and we will not dismiss the claim on this ground.

          ii.     Property Or Any Property Exchanged
                    For Such Property Owned Or Operated By
                    <u>An Agency Or Instrumentality Of The Foreign State</u>

Greece argues that "[c]laimants do not allege, nor can they given the facts of this case, that Sgt. LaLoup's body, including his heart . . . is 'owned or operated' by an agency or instrumentality of Greece."  Greece Reply at 6.

Under the FSIA, an "agency or instrumentality" is any entity

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, . . . and

(3) which is neither a citizen of a State of the United States . . . nor created under the laws of any third country.

28 U.S.C. § 1603(b).

The plaintiffs allege that "Defendant, the Hellenic Republic ('Greece'), is a foreign country responsible for the action[s] of the doctors and employees at the Evangelismos General Hospital in Athens, located at Ypsilanti 45-47, 10676 Athens, which is a Greek institution."  Comp. ¶ 9.  Greece does not dispute that the Evangelismos Hospital is "an agency or instrumentality" of that nation.  The plaintiffs do allege facts -- recited above -- that give rise to the reasonable inference that Sgt. LaLoup's heart is owned by Evangelismos Hospital -- the Hospital concededly removed the heart and retained it at the time of autopsy, and it returned a different heart to the family.  We will not grant the motion to dismiss on this ground.

iii.    The Agency Or Instrumentality Is Engaged
In A Commercial Activity In The United States

Greece argues that the plaintiffs "have not and cannot establish that any agency or instrumentality of Greece, much less Greece itself, is engaged in a commercial activity in the United States."  Greece Reply at 7.

In support of the argument that Greece is engaged in commercial activity in the United States, the plaintiffs assert that

> the Hellenic Republic engages in a tremendous amount of commercial activity in the United States.  The Hellenic Republic operates numerous consulates and honorary consulates in the United States and its territories.  The Hellenic Republic promotes its business interests through Economic and Commercial Offices in the U.S. and sponsors tourism through Tourist Offices.  Such commercial activity is sufficient to satisfy the final prong of Section 1605(a)(3).

Pl. Resp. at 28.

This argument is wanting.  First, a plain reading of the statute requires the plaintiffs to show that the agency or instrumentality of the foreign state that owns the taken property is engaged in a commercial activity in the United States, and not only that the foreign sovereign itself is engaged in such activity.  The plaintiffs do not even allege that the Evangelismos Hospital is engaged in commercial activity in the United States.

To be sure, courts have found the commercial activity prong of § 1605(a)(3) to be met where plaintiffs show that the foreign sovereign itself is engaged in commercial activity in the United States.  See, e.g., Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 712 (9th Cir. 1992) (finding this prong met where the agency or instrumentality was found to be the Inmobiliaria del Nor-Oeste, S.A. ("INOSA") and where the Court considered the commercial activity of Argentina, the sovereign that had taken control of INOSA, in determining whether the

§ 1605(a)(3) exception applied).  But even if plaintiffs could show the applicability of  §

1605(a)(3) by alleging facts sufficient to give rise to the reasonable inference that Greece itself is

engaged in commercial activity in the United States, we would have to conclude that the

plaintiffs have failed to do so.

   The FSIA defines "commercial activity" as "either a regular course of commercial

conduct or a particular commercial transaction or act", and it explains that "[t]he commercial

character of an activity shall be determined by reference to the nature of the course of conduct or

particular transaction or act, rather than by reference to its purpose."  28 U.S.C. § 1603(d).  The

Supreme Court has read § 1603(d) to mean that "when a foreign government acts, not as a

regulator of a market, but in the manner of a private player within it, the foreign sovereign's

actions are 'commercial' within the meaning of the FSIA."  Weltover, Inc., 504 U.S. at 614.  In

Weltover, the Supreme Court explained that "the issue is whether the particular actions that the

foreign state performs (whatever the motive behind them) are the type of actions by which a

private party engages in 'trade and traffic or commerce.'"  Id.  (quoting Black's Law Dictionary

270 (6th ed. 1990)) (emphasis in original).

   As Greece explains, "none of the activities plaintiffs identify is in any way

commercial in its nature or in its purpose.  Indeed, the type of conduct plaintiffs assert as

'commercial' are quintessentially sovereign acts that are protected by law."  Greece Reply at 7.

Greece cites the Vienna Convention on Diplomatic Relations (1961) and the Vienna Convention

on Consular Relations (1963) in support of its assertions.

   The plaintiffs identify three activities that they allege constitute commercial

activity Greece engages in in the United States: (1) establishing and maintaining consulates, (2)

"promot[ing] its business interests through Economic and Commercial Offices", and (3)

"sponsor[ing] tourism" through tourist offices.  These are not the type of actions a private party engages in, but are instead the activities of a sovereign, as the Vienna Convention on Consular Relations makes clear.  The Vienna Convention on Consular Relations governs the establishment of consular posts and the scope of consular functions.  See Vienna Convention on Consular Relations (1963), Art. 4-5.  Under Article 5, consular functions include "furthering the development of commercial, economic, cultural and scientific relations between the sending State and the receiving State and otherwise promoting friendly relations between them . . . ."  Id.

The activity the plaintiffs allege simply is not commercial within the meaning of § 1603(d) and § 1605(a)(3).  The claim thus does not fall within the exception to the FSIA, and we lack jurisdiction over it.  The essence of the restrictive theory of sovereign immunity embodied in the Tate Letter and now the FSIA is that a sovereign is liable only with respect to private acts, and the commercial activity requirement is at the heart of this analysis.  See, e.g., Weltover, Inc., 504 U.S. at 612 ("the Act (and the commercial exception in particular) largely codifies the so-called 'restrictive' theory of foreign sovereign immunity").  The FSIA thus deprives us of jurisdiction in this case as to Greece and its hospital agency in Athens.

## IV.   Conclusion

For the reasons stated herein, we will grant in part and deny in part the federal defendants' motion to dismiss, and we will grant the Hellenic Republic's motion to dismiss.


BY THE COURT:

/S/ STEWART DALZELL, J.