IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CRAIG LALOUP, et ux. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA | : | NO. 13-7124 |

MEMORANDUM

Dalzell, J.                                                                                          March 20, 2015

## I.      Introduction

Plaintiffs Craig and Beverly LaLoup are suing the United States of America for negligent infliction of emotional distress by the Marine Corps in the course of its informing them that the body of their son, Marine Sergeant Brian LaLoup, had been returned to them without his heart after his death and autopsy while deployed in Athens, Greece.[1]

---

[1] The LaLoups filed their initial complaint on December 6, 2013, and an amended complaint on December 11, 2013. They brought three claims against the United States Department of Defense, the United States Department of the Navy, the United States of America, the Hellenic Republic, and Evangelismos General Hospital in Athens.

In LaLoup v. United States, 29 F. Supp. 3d 530 (E.D. Pa. 2014), we dismissed all claims against the Department of Defense, Department of the Navy, Hellenic Republic, and Evangelismos General Hospital. We also dismissed Counts I and II. The LaLoups proceeded on their sole remaining claim, Count III, for negligent infliction of emotional distress, against the only remaining defendant, the Government.

We did not grant the Government's motion to dismiss the negligent infliction of emotional distress claim because, at that early stage, drawing all reasonable inferences in the plaintiffs' favor, the complaint sufficed to state a claim on that count.  Id. at 544.  We left open -- pending discovery -- the question of whether the Marine Corps owed a duty to the LaLoups as a deceased Marine's next-of-kin. As we explained, the existence of a duty is a matter of law for the court to decide. Id. (citing R.W. v. Manzek, 888 A.2d 740, 746 (Pa. 2005)). At that time we could not determine whether there was a duty because "the record lack[ed] information that would assist us in reaching a conclusion on this point such as, inter alia, the nature of a CACO's job, any provisions in the contract Sgt. LaLoup signed when he entered the Marines regarding the care of his body in the event of his death, and any Marines procedures that would shed light on the question." Id.

After discovery, the LaLoups moved for partial summary judgment (the "PSJ"). The Government responded with a motion to dismiss, or, in the alternative, motion for summary judgment (the "MTD").

In their motion for partial summary judgment, the LaLoups argue that the Government owed them a duty of care (1) not to withhold information from them as his next-of-kin about Sgt. LaLoup, the deceased service member, and (2) to take all necessary steps to preserve, recover, and return Sgt. LaLoup's remains to them. PSJ at 6, 8-9.

In response, the Government argues that we should dismiss the LaLoups' complaint because they cannot state a claim for negligent infliction of emotional distress under the Federal Tort Claims Act ("FTCA"), as 28 U.S.C. § 2680(h) bars claims based upon a misrepresentation. MTD at 7. In the alternative, the Government argues that it, and not the LaLoups, is entitled to summary judgment because the LaLoups cannot establish the required duty between the Marine Corps and themselves to support their negligent infliction of emotional distress claim under Pennsylvania law. MTD at 11.

## II.   <u>Standards of Review</u>

As the LaLoups filed a motion for partial summary judgment and the Government filed a motion to dismiss, or, in the alternative, motion for summary judgment, we will discuss both legal standards as they apply to the arguments before us.

### A.   <u>Motion to Dismiss</u>

If we determine at any time that we lack subject-matter jurisdiction, we must dismiss the action. Fed. R. Civ. P. 12(h)(3). Parties may assert such a defense by motion. Fed. R. Civ. P. 12(b)(1). A motion under Rule 12(b)(1) may be treated as either a facial or factual challenge to

the court's subject-matter jurisdiction. Gould Elec. Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000). In reviewing a facial attack, we must only consider -- in the light most favorable to the plaintiff -- the allegations of the complaint and documents attached thereto. Id. But in a factual attack we may consider evidence outside the pleadings. Id. We may therefore consider affidavits, depositions, and testimony to resolve factual issues bearing on jurisdiction. Gotha v. United States, 115 F.3d 176, 179 (3d Cir. 1997), citing Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891-92 (3d Cir. 1977) (explaining that the court is free to weigh the evidence to satisfy itself as to the existence of its power to hear the case). Factual attacks under Rule 12(b)(1) differ markedly from motions under Rule 12(b)(6) and Rule 56 because "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." Mortensen, 549 F.2d at 891.The plaintiff bears the burden of showing that subject-matter jurisdiction exists. Id.

Our Court of Appeals has cautioned that district courts must be careful not to reach the merits of a case when deciding Rule 12(b)(1) motions, and so we are to demand less by way of jurisdictional proof than we would at the trial stage. CNA v. United States, 535 F.3d 132, 144 (3d Cir. 2008) (quoting Gould, 220 F.3d at 178). We are obliged to impose a lower factual showing than would be required to succeed on the merits of a plaintiff's claims at trial so that we do not prematurely dismiss claims that might be established given the benefit of discovery. S.R.P. ex rel. Abunabba v. United States, 676 F.3d 329, 344 (3d Cir. 2012); CNA, 535 F.3d at 145.

Where jurisdictional challenges are intertwined with merits challenges under the FTCA, our Court of Appeals has instructed district courts to treat such challenges as jurisdictional ones.

See, e.g., CNA, 535 F.3d at 144 (explaining that the approach of the Third Circuit has been to "make disputes over the scope-of-employment requirement . . . jurisdictional."); Gould, 220 F.3d at 178 (explaining that "when the merits and jurisdiction are closely related, a court may determine subject matter jurisdiction without reaching the merits . . . .").

The United States answered the amended complaint on August 6, 2014. See Def. Answer. We ordered the parties to complete discovery in October of 2014. See August 11, 2014 Order. We have therefore moved into the realm of a factual challenge to our subject-matter jurisdiction. See Mortensen, 549 F.2d at 891-92 (explaining that the court may make a factual evaluation under Rule 12(b)(1) at any stage of the proceeding after the answer has been served until after the trial has been completed). As we explained, a factual challenge to subject-matter jurisdiction is quite different from a facial one. Id. at 891. In a factual challenge, the plaintiff has the burden of persuasion to show that jurisdiction exists, and if the defendant presents evidence contesting any allegations in the pleadings, then the presumption of truthfulness does not attach to the plaintiff's allegations, and the plaintiff may present facts by affidavit, deposition, or evidentiary hearing. Moyer Packing Co. v. United States, 567 F. Supp. 2d 737, 748 (E.D. Pa. 2008).

### B. Summary Judgment

Fed. R. Civ. P. 56(a) provides:

> A party may move for summary judgment, identifying each claim or defense -- or the part of each claim or defense -- on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

A party moving for summary judgment bears the initial burden of informing the district court of the basis for its argument that there is no genuine issue of material fact by "identifying

those portions of the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue

of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations

omitted).  If the moving party meets this initial burden, Fed. R. Civ. P. 56 then obliges the non-

moving party to show, via submissions beyond the pleadings, that there are genuine factual

issues for trial. Id. at 324. We treat cross-motions for summary judgment as if they were two

distinct, independent motions. Arnold Pontiac-GMC, Inc. v. General Motors Corp., 700 F. Supp.

838, 840 (W.D. Pa. 1988). In evaluating each motion, we consider the facts and inferences in the

light most favorable to the non-moving party. Marzano v. Computer Sci. Corp. Inc., 91 F.3d 497,

501 (3d Cir. 1996).

There is a genuine issue of material fact only when there is sufficient evidence such that a

reasonable juror could find for the party opposing the motion. Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 251-52 (1986) (explaining further that a mere scintilla of evidence is insufficient).

Material facts are those that would affect the outcome of the case under the governing law. Id. at

248. We may not make credibility determinations or weigh the evidence, and we must draw all

reasonable inferences in favor of the non-moving party. Reeves v. Sanderson Plumbing Prods.,

Inc., 530 U.S. 133, 150 (2000); Amour v. County of Beaver, PA, 271 F.3d 417, 420 (3d Cir.

2001). Our function is to determine whether there is a genuine issue for trial, and we may not

prevent a case from reaching a jury simply because we favor one of several reasonable views of

the evidence. Abraham v. Raso, 183 F.3d 279, 287 (3d Cir. 1999) (citing Anderson, 477 U.S. at

249).

III.     **Factual Background**

As the Government has made a factual attack as to our subject-matter jurisdiction under Rule 12(b)(1), and both parties have moved for summary judgment, we may consider matters outside the pleadings, including affidavits and depositions. We recite the facts pertinent to the resolution of the parties' motions.

On August 12, 2012, Marine Sergeant Brian LaLoup died of a self-inflicted gunshot wound while deployed on active duty in Athens, Greece. Amend. Compl. at ¶¶ 18, 32-37; MTD at 3; PSJ at 3. Upon Sgt. LaLoup's death, the Marine Corps began the process of notifying the next-of-kin -- his parents, Craig and Beverly LaLoup -- in accordance with its Casualty Assistance Calls Program ("the Program"), as documented in Marine Corps Order 3040.4 (the "MCO"), attached by the Government as MTD Ex. G.

When the Marine Corps must notify next-of-kin of a casualty incident, it appoints a Casualty Assistance Call Officer ("CACO"). MTD Ex. G at 6; Dixon Dep. at 18:1-19:16. CACOs are "liaisons who assist with benefits, entitlements, burial, making sure the next of kin gets personally notified of the death, [and] assist[s] with copies of investigations." Castle Dep. at 27:9-15. The CACO's task begins with notifying the next-of-kin of the casualty incident, and, after this notification and condolence phase, the CACO assists the next-of-kin with mortuary affairs and funeral honors, benefits and entitlements, and transition to the Marine Corps' long-term assistance program. MTD Ex. G at 6 (notification and condolence); id. at 18 (mortuary affairs and funeral honors); id. at 27 (benefits and entitlements); id. at 31 (long-term assistance program). See also Dixon Dep. at 21:14-24:5.

The difficult task of notifying the LaLoups fell to Staff Sergeant ("SSgt.") David McClendon. MTD at 3; McClendon Dep. at 31:15-33:6. In the early morning hours of August

12, 2012, SSgt. McClendon drove from Wilmington, Delaware, to Craig and Beverly LaLoup's home in Pennsylvania to notify them in person of Sgt. LaLoup's death. McClendon Dep. at 37:11-38:2. Gunnery Sergeant ("GySgt.") Rick Montoya accompanied him.[2] Id. The LaLoups were not at home, but returned when their son, John, notified them that the two Marines were there waiting. Id. at 39:15-40:22.

After the LaLoups returned home, SSgt. McClendon and GySgt. Montoya confirmed that Sgt. LaLoup had died and attempted to complete their notification protocol. Id. at 46:4-10. Craig LaLoup interrupted the process and asked that the Marines leave them alone to grieve. Id.; see also Beverly LaLoup ("BL") Dep. at 32:15-33:20 (confirming that after informing her and her husband that their son had died, Mr. LaLoup asked the Marines to leave). SSgt. McClendon and GySgt. Montoya complied and left, in accordance with procedure. MTD at 4; MTD Ex. G at 14 (explaining that CACOs "must be aware of the [next-of-kin's] right to privacy" and "not stay longer than necessary"). Before they left, the CACOs provided the LaLoups with a physical copy of the Personnel Casualty Report ("PCR"). McClendon Dep. at 68:6-14. Later, the LaLoups found that report on the coffee table. BL Dep. at 33:21-34:1. The LaLoups learned by reading the paper left on their coffee table that Sgt. LaLoup had killed himself. Id. at 34:7-16.

The next day, August 13, the CACOs returned to complete the notification process and start on some of the funeral honors procedures. McClendon Dep. at 52:22-53:12. Mrs. LaLoup signed paperwork to receive the death gratuity that is paid to the primary next-of-kin for deceased service members. Id. at 52:22-53:12. From August 12 through August 20, SSgt.

---

[2] The MCO explains that "no specific instructions can be given to cover the varied and sometimes difficult situations that may arise when making personal notifications," but there are guidelines. MTD Ex. G at 13. One such guideline is that the assigned CACO "must be accompanied by a minimum of one other individual to provide moral support or assistance in the event the family member becomes ill or aggressive" and must never make personal notification calls alone. Id. at 13, 16.

McClendon continued to gather information and check in on the LaLoups while Sgt. LaLoup's body remained in Greece. Id. at 97:13-98:16.

After Sgt. LaLoup's body arrived at Dover Air Force Base, the Armed Forces Medical Examiner Service ("AFMES") autopsied his body. MTD at 4. Mrs. LaLoup knew from the CACOs that AFMES would autopsy Sgt. LaLoup's body in Dover, Delaware. BL Dep. at 38:17-39:2. The autopsy revealed that Sgt. LaLoup's remains were incomplete because his heart was missing. MTD Ex. E (Aug. 22, 2012 Letter from the Armed Forces Medical Examiner to the Marines Casualty Office). AFMES sent the letter with this information to the Marine Corps liaison at Dover, SSgt. Michael Johnson. McClendon Dep. at 140:1-142:5. On August 22, SSgt. Johnson told SSgt. McClendon that Sgt. LaLoup's heart was missing. Id. at 83:9-21. SSgt. Johnson relayed that information to SSgt. McClendon so that SSgt. McClendon could ensure that Mrs. LaLoup signed the form that would allow the release of Sgt. LaLoup's incomplete body for burial. Id. at 140:1-142:5.[3]

SSgt. McClendon asked for guidance on how to approach discussing this topic with Mrs. LaLoup. Id. at 145:2-13. SSgt. Johnson advised him that he should tell Mrs. LaLoup that the heart was missing if she asked, but that if she did not inquire about the missing remains, he did not need to provide that detail. Id. at 145:2-13, 158:8-12. SSgt. McClendon understood this guidance to mean that he should tell Mrs. LaLoup that Sgt. LaLoup's body was not intact, and if she asked what was missing, he should tell her about the heart. Id. at 146:10-24.[4]

---

[3] Beverly LaLoup had to sign this form because Sgt. LaLoup designated her as the person authorized to direct disposition of his body. MTD Ex. I at 20. A sample of the form Mrs. LaLoup had to sign -- CJMAB Form 1 -- appears in the MCO. See MTD Ex. G at 23. Both parties attached a copy of the form Mrs. LaLoup completed. PSJ Ex. D; MTD Ex. F.

[4] This is consistent with Gerald Castle's testimony on the appropriate and expected conduct of CACOs who must inform families that a deceased Marine's remains are incomplete. Mr. Castle is the Head of the Casualty Section, which oversees the Marine Corps Casualty Assistance Program. Castle Dep. at 15:1-9. Mr. Castle agreed that CACOs should handle

The parties disagree about what SSgt. McClendon said to Mrs. LaLoup in a telephone conversation on the night of August 23. MTD at 5. SSgt. McClendon had called Mrs. LaLoup to tell her that she needed to sign a form in order to have Sgt. LaLoup's remains released. McClendon Dep. at 152:17-153:9, 160:16-20. The parties dispute whether Mrs. LaLoup asked SSgt. McClendon what parts of Sgt. LaLoup's remains were missing and what SSgt. McClendon said in response.[5]

The day after the phone call, August 24, SSgt. McClendon visited Mrs. LaLoup at her place of employment. PSJ at 10. The parties do not dispute that SSgt. McClendon knew Sgt. LaLoup's heart was not with the rest of his remains when he made this visit. MTD at 4-5. Both SSgt. McClendon and Mrs. LaLoup agree that they did not discuss Sgt. LaLoup's remains during that visit. McClendon Dep. at 156:1-157:16; BL Dep. at 57:2-60:3. Rather, SSgt. McClendon explained what the CJMAB Form 1 said, and Mrs. LaLoup signed it. PSJ Ex. D; MTD Ex. F (Aug. 24, 2012 CJMAB Form 1, signed by Mrs. LaLoup and dated). The form authorized the

---

informing family members that the decedent's remains are incomplete in the same manner as informing them that the decedent has died. Id. at 126:15-21. Indeed, Mr. Castle clarified that "[f]or non-intact remains as made known to the Marine Corps by the medical examiner, CACOs…are briefed to notify the family that the remains are not intact, that the CJMAB form needs to be completed to understand their desires, and, if asked what portions are not present with the body, to provide the information." Id. at 127:1-12.

[5] According to Mrs. LaLoup, when SSgt. McClendon called her to arrange for a time to sign the form that would permit the release of Sgt. LaLoup's body, she asked what SSgt. McClendon meant by the body being incomplete. BL Dep. at 56:7-21. SSgt. McClendon explained that there were parts missing, and when she asked him what parts were missing, he said the scalp. Id. According to SSgt. McClendon, he never told anyone that a piece of Sgt. LaLoup's scalp was missing. McClendon Dep. at 162:19-23. SSgt. McClendon says that Mrs. LaLoup did not ask about what body parts were missing, and so he did not specifically tell her that the heart was not with the remains. Id. at 151:3-18. SSgt. McClendon did not read anything to Mrs. LaLoup from the AFMES letter indicating that Sgt. LaLoup's heart was missing. Id. at 156:1-157:23. SSgt. McClendon said he chose not to tell Mrs. LaLoup about the missing heart because she did not ask for details about the missing remains and because of the sensitivity of the issue and the guidance he received from SSgt. Johnson. Id. at 158:8-12.

release of Sgt. LaLoup's incomplete remains for burial but reserved Mrs. LaLoup's right to be notified if more remains were recovered. Id.[6]

On August 29, Sgt. LaLoup was buried with full military honors. PSJ at 3. After the funeral, the LaLoups met with First Sergeant ("1Sgt.") Jonathan Dixon, another CACO. The parties dispute exactly how Sgt. LaLoup's non-intact remains came up in discussion, but by the end of the meeting, 1Sgt. Dixon had informed the LaLoups that Sgt. LaLoup's body was incomplete because his heart was missing.[7]

## IV.   **Discussion**

The LaLoups' claim for negligent infliction of emotional distress under the FTCA must have a basis in Pennsylvania tort law. See 28 U.S.C. § 1346(b). If the LaLoups' claim has a basis in Pennsylvania law, it also must not fall within any of the exceptions to the FTCA. See 28

---

[6] The top portion of CJMAB Form 1 reads:
DISPOSITION OF REMAINS ELECTION STATEMENT
INITIAL NOTIFICATION OF IDENTIFIED PARTIAL REMAINS
MTD Ex. F; PSJ Ex. D. The form asks the person authorized to direct disposition of the remains to acknowledge "that every effort is being made for the full recovery of remains, but only partial remains have been recovered and identified at this time. I am aware that additional subsequent remains may be recovered at a later date and individually identified or designated for inclusion with a group interment." Id.

Beverly LaLoup indicated via her initials that she "would like to receive the incomplete remains that have been identified at this time" and "[i]n the event that further remains are individually identified, [she] would like to be notified and given the choice of accepting subsequent portions for disposition." Id. Mrs. LaLoup's other choices were to have the Marine Corps hold the remains "until other substantial remains believed to be from the deceased are identified" or not to be notified if other remains were found. Id.

[7] According to Mrs. LaLoup, she asked 1Sgt. Dixon what would happen to the missing pieces of Sgt. LaLoup's scalp if they were recovered, but 1Sgt. Dixon did not understand what she was talking about. BL Dep. at 68:7-19. According to 1Sgt. Dixon, Mrs. LaLoup commented that mortuary affairs had done a great job, given that parts of Sgt. LaLoup were missing, and he took Mrs. LaLoup's comment as an indication that she did not know the heart was missing. Dixon Dep. at 54:17-55:23. By all accounts, 1Sgt. Dixon then explained to Mrs. LaLoup that Sgt. LaLoup's body was not intact because his heart was not with his body. BL Dep. at 69:2-70:10; Craig LaLoup Dep. at 25:4-15; Dixon Dep. at 55:18-23.

U.S.C. § 2680(a)-(n). As Section 1346(b) is the rule, and Section 2680 is an exception thereto, we first consider the LaLoups' claim in light of Section 1346(b).

### A.     Section 1346(b) And Liability Under Pennsylvania Law

Both the LaLoups and the Government moved for summary judgment on the issue of whether the Marine Corps owed the LaLoups a duty of care under Pennsylvania law. MTD at 11-12; PSJ at 1. The LaLoups argue that the United States owed them, as next-of-kin, a duty of care based on a special relationship. PSJ at 1-2. The Government responds that Pennsylvania law only allows negligent infliction of emotional distress ("NIED") claims under narrow circumstances -- not present in this case -- and that there is no duty of care between the Marine Corps and the LaLoups as next-of-kin. MTD at 12.

The United States, by virtue of sovereign immunity, may not be sued without its consent. United States v. Mitchell, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."). We construe the scope of a waiver of sovereign immunity strictly and in favor of the sovereign. Lane v. Pena, 518 U.S. 187, 192 (1996).

The FTCA gives district courts exclusive jurisdiction over

> civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

Because the statute looks to "the law of the place where the act or omission occurred," we must apply state substantive law to determine liability under the FTCA. In applying state substantive law, we apply the law as interpreted by that state's highest court. McKenna v. Pacific Rail Serv., 32 F.3d at 820, 825 (3d Cir. 1994) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938)). Absent guidance from the state's highest court, we refer to decisions of the state's intermediate appellate courts for assistance in determining how the highest court would rule. Id.

The Pennsylvania Supreme Court has definitively recognized only three types of NIED claims. Hershman v. Muhlenberg Coll., 17 F. Supp. 3d 454, 459 (E.D. Pa. 2014). A plaintiff may recover for NIED if he or she (1) suffered a physical injury causing the emotional distress, Kazatsky v. King David Mem'l Park, Inc., 527 A.2d 988, 992 (Pa. 1987), (2) did not suffer a personal impact but was in the zone of danger, Niederman v. Brodsky, 261 A.2d 84, 90 (Pa. 1970), or (3) witnessed an accident causing serious injury to a close family member. Sinn v. Burd, 404 A.2d 672, 686 (1979).

Recent case law has called into question the exclusivity of this list. In Toney v. Chester County Hospital, 36 A.3d 83 (Pa. 2011), an equally-divided Pennsylvania Supreme Court affirmed a Pennsylvania Superior Court decision that expanded NIED causes of action to include those predicated on certain special relationships. See Weiley v. Albert Einstein Med. Ctr., 51 A.3d 202, 217 n.16 (Pa. Super. Ct. 2012) (explaining that the Pennsylvania Supreme Court's decision in Toney had the effect of affirming the Pennsylvania Superior Court's decision since the Supreme Court was evenly divided, but that the opinion in affirmance has only persuasive, not precedential, value).

In Toney, the Pennsylvania Supreme Court decided that NIED claims predicated on pre-existing relationships are limited to those relationships "involving duties that obviously and

objectively hold the potential of deep emotional harm in the event of breach . . . [and] the special relationships must encompass an implied duty to care for the plaintiff's emotional well-being. The potential emotional harm must not be the type that a reasonable person is expected to bear." 36 A.3d at 95. The Pennsylvania Supreme Court then held that "relationships involving life and death" fall into such a category, and therefore found that the doctor-patient relationship in the "sensitive and emotionally charged field of obstetrics" so qualified. Id.

In reviewing other states' jurisprudence on NIED liability based upon special relationships, the Pennsylvania Supreme Court observed "the undeniable truth that some negligent breaches of duties in preexisting relationships will give rise to severe emotional distress that should be compensable…However, equally true, is the fact that not all breaches of duties should result in compensable emotional distress claims." Id. at 91. Rather, those "relationships involving life and death fall within this category." Id. at 95. The Supreme Court observed that other jurisdictions had included "the relationship between the loved ones of the deceased and those responsible for caring for the corpse" as one such pre-existing relationship. Id. at 92.

Because the Toney decision was not precedential, the exact dimensions of NIED claims in Pennsylvania remain unresolved. Hershman, 17 F. Supp. 3d at 458. Not all Pennsylvania courts predict that the Pennsylvania Supreme Court will eventually recognize NIED claims based upon the breach of a special relationship. Id. at 460 n.6 (collecting cases). Pennsylvania intermediate courts that recognized NIED claims based upon contractual or fiduciary relationships have found only certain doctor/patient relationships and the relationship between an adoption agency and adoptive parents to apply to support such a claim and refused to extend liability any further. Walsh v. University of Pittsburgh, 2015 WL 128104, *15 (W.D. Pa. Jan. 8,

2015) (Kelly, J.). Indeed, when Pennsylvania courts have found a basis for liability under the special relationship theory described in <u>Toney</u>, it has been in limited circumstances highly factually analogous to <u>Toney</u>. <u>See</u> <u>Nicholson-Upsey ex rel. Nicholson v. Tuoey</u>, No. 4525, 2013 WL 8596353, *11 (Pa. Com. Pl. May 7, 2013) (Bernstein, J.) (explaining that the case was "remarkably similar" to <u>Toney</u>).

Otherwise, Pennsylvania courts have not extended liability under the special relationship theory in <u>Toney</u>. In <u>Weiley v. Albert Einstein Medical Center</u>, the Pennsylvania Superior Court found that a hospital did not owe a deceased patient's next-of-kin a fiduciary duty of care sufficient to meet the duty element of a NIED claim on the basis of the limitation in <u>Toney</u>. 51 A.3d at 218. <u>See</u> <u>also</u> <u>Freedman v. Fisher</u>, 2014 WL 4931306, *3 (E.D. Pa. Sept. 30, 2014) (Ditter, J.) (explaining and approving of the reasoning in <u>Toney</u> that a relative's claim cannot derive from a duty to the patient, as "a doctor should be able to give all of his attention to the patient and not be worried about whether he has perceived and prevented any emotional distress, severe or otherwise, in one or more persons previously unknown to him, persons whom he may not have even met."); <u>Hershman</u>, 17 F. Supp. 3d at 460 n.8 (collecting cases where courts have refused to extend NIED liability). Notwithstanding the Pennsylvania Supreme Court's observation in <u>Toney</u> that the special relationship basis for liability is most likely to arise in circumstances encompassing life and death, courts applying Pennsylvania law have found special relationships to exist only in the context of obstetrics or adoption, not in burial or the disposition of remains.

We predict that the Pennsylvania Supreme Court will eventually recognize in a precedential opinion the "special relationship" basis for a NIED claim, but only under the very limited circumstances <u>Toney</u> described.

14

If <u>Toney</u> became precedential through a subsequent opinion, Pennsylvania lower courts faced with NIED claims based upon a special relationship theory would still proceed by first evaluating whether such a duty existed. In <u>Toney</u>, the Pennsylvania Supreme Court left "the legal question of whether a sufficient duty exists to [its] trial judges to decide on a case-by-case basis, at some point prior to trial," and advised such judges to consider a five-factor test. 36 A.3d at 95 & n.11. Trial judges are to determine whether a duty exists in a particular case by weighing several discrete factors, including the: (1) relationship between the parties, (2) social utility of the actor's conduct, (3) nature of the risk imposed and foreseeability of the harm incurred, (4) consequences of imposing a duty on the actor, and (5) overall public interest in the proposed solution. <u>Id.</u> (citing <u>Bilt-Rite Contractors, Inc. v. The Architectural Studio</u>, 866 A.2d 270, 281 (Pa. 2005)).

As we apply Pennsylvania substantive law to determine whether the Marine Corps owed the LaLoups a duty of care, we will proceed through the five-part test as <u>Toney</u> articulated it.

First, we consider the relationship between the parties. Sgt. Brian LaLoup -- as Craig and Beverly LaLoup's son and an enlisted Marine -- was the entire nexus of the relationship between the LaLoups and the Marine Corps. At all times, even when Sgt. LaLoup was a minor and his parents had to consent to his enlistment, Sgt. LaLoup's contractual obligations ran to the Armed Forces of the United States, and whatever reciprocal duties the Armed Forces undertook were to Sgt. LaLoup himself and not to his parents.[8] As part of his contract with the Marine Corps, Sgt. LaLoup designated a family member as his next-of-kin and to direct disposition of his body in the event of his death. MTD Ex. I at 20. Unsurprisingly, Sgt. LaLoup designated one of his parents. <u>Id.</u> Sgt. LaLoup's designation, however, does not constitute a pre-existing relationship

---

[8] Upon his initial enlistment, the LaLoups signed a Parental/Guardian Consent for Enlistment on May 6, 2008. MTD Ex. I at 12. Sgt. LaLoup extended his enlistment on February 11, 2011. <u>Id.</u> at 1 (Agreement to Extend Enlistment).

between the Marine Corps and his parents. The relationship between the Marine Corps and the

LaLoups commenced only upon Sgt. LaLoup's death and existed solely because of the Marine

Corps' relationship with Sgt. LaLoup.

The Marine Corps' relationship with the LaLoups was neither the kind of "preexisting

relationship" contemplated in <u>Toney</u> nor the type of contractual relationship that other states

have found can ground NIED liability when the contract is for mortuary services. Rather, the

relationship is akin to that of the hospital in <u>Weiley</u> where the duty of care was to the patient and

there was no duty to the next-of-kin regarding the disposition of the patient's remains.[9] The lack

of a pre-existing relationship between the Marine Corps and the LaLoups weighs against

imposing a duty on the Government, the Marine Corps, or Marine CACOs.

Second, we consider the social utility of the actor's conduct. According to the MCO,[10]

the Marine Corps' Casualty Assistance Calls Program is meant to "ensure survivors are properly

notified of a casualty incident and to assure assistance in applying for all benefits and

entitlements." MTD Ex. G at 1. All tasks described in the Program are to be "conducted in a

manner that will promote the best interests of the casualty, the Next of Kin (NOK), and the

---

[9] Further, the nature of the relationship between Sgt. LaLoup and the Marine Corps powerfully militates against finding a pre-existing relationship in support of a duty between the Marine Corps and Sgt. LaLoup's parents. As a Marine, the <u>Feres</u> doctrine would bar any cause of action Sgt. LaLoup might have brought under the FTCA. <u>See</u> <u>Feres v. United States</u>, 340 U.S. 135, 146 (1950) (concluding that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service."); <u>see</u> <u>also</u> <u>Loughney v. United States</u>, 839 F.2d 186, 188 (3d Cir. 1988) (explaining that under <u>Feres</u> military status is dispositive and therefore the injured serviceman's "wife and guardian is barred from asserting a claim on her husband's behalf against the Government under the FTCA.").

[10] The LaLoups rely on both deposition testimony and MCO 3040.4 to try to impose a legal duty on the Marines. But the existence of such an order to govern CACO conduct does not by itself create a duty of care, and neither does any particular language in the MCO referring to "duty." Whether there exists a legal duty of care is a question of law, and the unsurprising use of the word "duty" by the Marine Corps in its orders does not provide an answer to that question. By its very terms, the FTCA requires that the plaintiff identify a duty <u>under state law</u> that the defendants breached. <u>See</u> <u>Cecile Indus., Inc. v. United States</u>, 793 F.2d 97, 99 (3d Cir. 1986).

Marine Corps." Id. CACOs are instructed that "[s]ympathy, courtesy, precise information, and service are the cornerstones on which the [Program] is built and is a sacred obligation of the Marine Corps." Id. at 6.

The Program has the utmost social utility, and CACOs "perform a valuable and useful activity to society." See Althaus ex rel. Althaus v. Cohen, 756 A.2d 1166, 1170 (Pa. 2000). Society has an interest in the sensitive, prompt, and holistic service the Marine Corps provides to next-of-kin through its CACOs. Imposing tort liability for the supposed negligent performance of that service would burden the Marine Corps and make every notification fraught with the specter of liability while providing limited additional incentives for CACOs to conduct such notifications to the utmost of their abilities. The social utility of this conduct therefore significantly weighs against imposing a duty on the Government, the Marine Corps, or Marine CACOs.

Third, we consider the nature of the risk imposed and the foreseeability of the harm incurred. The Marine Corps unquestionably recognizes the seriousness of notifications, both by directing commanders to select CACOs possessing "the maturity, experience, and ability to deal with unusual and difficult circumstances" and by also setting forth specific guidance for CACOs' conduct during notifications.[11] MTD Ex. G at 6, 14-15. Notifications are meant "to inform the

---

[11] The MCO instructs CACOs:

> (4) Use good judgment and do not pass graphic or embarrassing details. Do not speculate, embellish or given personal opinions.
>
> (5) When addressing the casualty's family, make every effort to display an understanding and helpful demeanor which will give comfort to a bereaved family.
>
> (6) Speak naturally and at a normal pace keeping in mind that the NOK [next-of-kin] may need to hear the information several times before the notification visit is complete. An overly formal approach, or a flippant manner, may seriously damage the Marine Corps' reputation with the family, and possibly an entire

17

casualty's next of kin (NOK) of the incident and surrounding circumstances." Id. at 10. The risks of a negligently-performed notification include distress in the next-of-kin, lack of subsequent cooperation by the next-of-kin, risk of harm to the notifying CACOs, and reputational harm to the Marine Corps. The harm from these risks is foreseeable. Family members are likely to be distressed if during the notification the CACO is too flip, or too formal, or appears to be concealing information, or offers too many graphic details.

But the risks and foreseeable harms from a negligently-conducted notification do not differ from the risks and foreseeable harms of a non-negligently-conducted notification. This is the truth behind the wisdom of the MCO's observation that "no specific instructions can be given to cover the varied and sometimes difficult situations that may arise when making personal notifications" -- even though the Marine Corps provides guidelines.  Id. at 13. Family members, upon hearing of their loved one's death -- even if they benefit from a CACO's perfectly competent, sensitive, and non-negligent notification -- are all but certain to be distressed.  They may not be amenable to, or able to cooperate with, making funeral arrangements and discussing

---

> community. The actions of a CACO during the notification will establish the working relationship with the affected NOK…
>
> (7) Advise the NOK of all known details surrounding the casualty incident (use discretion). Never withhold information as it may lead the NOK to suspect a cover-up on the part of the Marine Corps, to include incidents of friendly fire and any investigations being conducted. Use information contained in the PCR [personnel casualty report] and information gathered from the reporting command. Do not embellish, speculate, or provide unsubstantiated information. If requested, you may provide the family with a copy of the PCR…

MTD Ex. G at 14-15.

In his deposition, Mr. Castle explained what "use discretion" meant:

> I would say if there are, in consideration of the next of kin, there may be very graphic details in those circumstances. Be considerate of their grief. You could paraphrase the circumstances, if necessary.

Castle Dep. at 79:14-20.

benefits. They may even react aggressively toward the CACOs, and may blame the Marine

Corps for their loved one's death, or, in their grief, suspect that some darker truth lurks behind an

already horrific reality. The risks and foreseeable harms therefore weigh against imposing a duty

on the Government, the Marine Corps, and Marine CACOs.

Fourth, we consider the consequences of imposing a duty on the actor. This consideration

is in light of any other relevant duties or obligations. See Althaus, 756 A.2d at 1170 ("Next, we

consider the consequence of burdening mental health professionals with a duty of care beyond

that owed to the patient."). The Marine Corps already considers notifying next-of-kin to be a

sacred obligation. The Marine Corps recognizes its obligation to deceased Marines to notify their

next-of-kin with respect and sensitivity, and in service of that goal advises its CACOs to be

forthright but to use discretion in revealing potentially upsetting or disturbing details. Imposing a

duty on this conduct would burden CACOs with the additional consideration of whether their

conduct subjects them or the Marine Corps to legal action should next-of-kin be dissatisfied with

the notification process. Overlaying an already fraught, emotionally difficult, and highly

sensitive process with the specter of litigation does not create any additional incentives for the

Marine Corps to behave honorably or create any additional guarantees that next-of-kin will be

treated with more sensitivity or respect than they already are. Tort liability might well discourage

in-person notifications, or at least constrain CACOs from using their common sense and good

judgment while conducting them, lest veering off script subject the Marine Corps to tort liability.

Tort law considerations should not interfere with the CACOs' exquisitely difficult task of

informing next-of-kin that their loved ones have died and assisting them in the aftermath. The

consequences of imposing any such duty on the actor therefore weigh against imposing a duty on

the Government, the Marine Corps, or Marine CACOs.

Fifth, we consider the overall public interest in the proposed solution. The LaLoups argue that the Marine Corps has, or should have, a duty of care to them as next-of-kin.  Imposing such a duty would only provide an avenue for seeking additional compensation to those family members who felt that the CACOs were negligent in their conduct when informing them that their loved one had died. There is obvious public interest in deceased Marines' next-of-kin receiving sensitive treatment and comprehensive information in the aftermath of their loved one's death.  But the proposed solution of tort liability does not render the Marine Corps more likely to competently discharge what it already considers to be a sacred obligation, and does not make it less likely that family members will suffer when Marine CACOs arrive to notify them of their loved one's death. Tort liability would provide grieving and aggrieved families with only the hollow succor of litigation and compensation from the Government's coffers. The overall public interest in the proposed solution weighs heavily against imposing a duty on the Government, the Marine Corps, or Marine CACOs.

We therefore find under Pennsylvania law that there is no pre-existing relationship or duty between the Government and a deceased Marine's next-of-kin to support liability in a negligent infliction of emotional distress claim. Without such a relationship and corresponding duty, the LaLoups cannot sustain a claim of negligent infliction of emotional distress under Pennsylvania law. Without a basis in Pennsylvania tort law, the LaLoups' claim under the FTCA fails as a matter of law.

Because we find that the Government had no duty of care to the LaLoups as Sgt. LaLoup's next-of-kin, we need not decide or consider the parties' disputed facts regarding how the LaLoups learned that Sgt. LaLoup's heart was not with his body when they buried him or the

ultimate whereabouts of his heart. Such disputed facts are not material to our determination of whether under Pennsylvania law the Government owed the LaLoups a duty of care.

We will grant the Government's motion to dismiss, or, in the alternative, motion for summary judgment, and deny the LaLoups' motion for partial summary judgment.

### B.    Section 2680(h) And The Scope Of The Misrepresentation Exception

The parties dispute whether the misrepresentation exception to the FTCA, embodied in 28 U.S.C. § 2680(h), bars the LaLoups' claim for negligent infliction of emotional distress.[12] The thrust of their dispute is whether the misrepresentation exception applies in non-commercial contexts. MTD at 7; PSJ at 1-2.

As we have found that there is no basis in Pennsylvania tort law to support the LaLoups' claim under the FTCA, we need not consider whether their claim falls within an exception to that statute.[13]

---

[12] 28 U.S.C. § 2680(h) provides: "The provisions of this chapter and section 1346(b) of this title shall not apply to -- … (h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights…"

[13] The Supreme Court has held that the "misrepresentation exception" encompasses claims for intentional or negligent concealment, misrepresentation, or omissions of material facts. United States v. Neustadt, 366 U.S. 696, 705-07 (1961). Where such an exception applies, the district court must dismiss the action for want of federal subject-matter jurisdiction. See Dalehite v. United States, 346 U.S. 15, 31 (1953). Section 2680(h) is not by its terms limited to commercial transactions. See 28 U.S.C. § 2680(h). However, after Neustadt, the Supreme Court decided Block v. Neal, 460 U.S. 289 (1983), and explained in a footnote that

> The "misrepresentation" exception applies only when the action itself falls within the commonly understood definition of a misrepresentation claim, which "has been identified with the common law action of deceit," and has been confined "very largely to the invasion of interests of a financial or commercial character, in the course of business dealings."

460 U.S. at 296 n.5. The Supreme Court in Block, however, decided the case based on its determination that Section 2680(h) "does not bar negligence actions which focus not on the Government's failure to use due care in communicating information, but rather on the Government's breach of a different duty." Id. at 297.

**V.     The LaLoups' Motion To Strike**

After we granted the Government's motion to file a reply, the LaLoups filed for leave to file a motion to strike the Government's reply and their own sur-reply. See Jan. 16, 2015 Gov't Motion for Leave to File; Jan. 20, 2015 Order Granting Gov't Motion for Leave to File; Jan. 26, 2015 Pl. Motion to Strike and Sur-Reply. The Government opposed the LaLoups' motion to strike. See Feb. 9, 2015 Gov't Resp. in Opp. to Motion to Strike.

Striking a brief is an extraordinary remedy reserved for flagrant disregard of the rules of the court. Manville Sales Corp. v. Paramount Sys., Inc., 1988 WL 54060, *3 (E.D. Pa. 1988) (Naythons, M.J.). The Government properly requested leave to file a reply and used that reply to address the LaLoups' arguments in their response. The LaLoups' sur-reply, in turn, responded to the Government's counter-arguments. Though this motions practice was heated, and verged on argumenta ad hominem, it was not in flagrant disregard of our rules or the Federal Rules of Civil Procedure. We will therefore deny the LaLoups' motion to strike the Government's reply but permit the filing of their sur-reply.

**VI.     Conclusion**

The LaLoups' claim for negligent infliction of emotional distress under the Federal Tort Claims Act depends on the existence of tort liability under Pennsylvania state law. Since there is

---

Although several Courts of Appeals have found a commercial context limitation in light of footnote 5 in Block, others have not. Compare Lawrence v. United States, 340 F.3d 952, 958 (9th Cir. 2003) (no commercial context limitation) with Kohn v. United States, 680 F.2d 922, 926 (2d Cir. 1982) (finding a commercial context limitation) and Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d 840, 855 (10th Cir. 2005) (pecuniary loss an essential element of misrepresentation). Our Court of Appeals has not held squarely on whether there is a commercial context limitation in the misrepresentation exception to the FTCA.

Regardless of the scope of the misrepresentation exception in Section 2680(h), the LaLoups' claim fails as a matter of law under Section 1346(b)(1). As we explained, since their claim does not fall within the FTCA, we need not decide whether it falls within any exception.

no special relationship or duty of care between the Government and the LaLoups as Sgt. LaLoup's next-of-kin, the LaLoups' claim fails as a matter of law.

We will therefore grant the Government's motion to dismiss, or, in the alternative, motion for summary judgment, deny the LaLoups' motion for partial summary judgment, and enter Judgment in favor of the United States. An appropriate Order follows.

BY THE COURT:

/S/ STEWART DALZELL, J.